**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, <br><br> v. <br><br> JDT, JUVENILE MALE, *Defendant-Appellant*. | No. 12-10005 <br><br> D.C. No. 4:11-cr-00435-RCC-DTF-1 <br><br> OPINION |

Appeal from the United States District Court
for the District of Arizona
Raner C. Collins, District Judge, Presiding

Argued and Submitted
September 11, 2013—San Francisco, California

Filed August 12, 2014

Before: Arthur L. Alarcón and Marsha S. Berzon, Circuit
Judges, and Jack Zouhary, District Judge.[*]

Opinion by Judge Alarcón;
Concurrence by Judge Berzon

---

[*] The Honorable Jack Zouhary, District Judge for the U.S. District Court for the Northern District of Ohio, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel vacated the district court's adjudication of juvenile delinquency on six counts of aggravated sexual abuse, in violation of 18 U.S.C. § 2241(c), remanded for consideration of all disposition options, including a suspension of delinquency, and affirmed in all other respects.

The panel held that the district court had jurisdiction over the defendant's juvenile delinquency proceedings pursuant to the Juvenile Justice and Delinquency Prevention Act, 18 U.S.C. § 5032, because the government presented a valid certification as to the need for the juvenile proceedings to take place in federal court. The panel held that a certification filed in the district court by a United States Attorney is presumed to be accurate, absent circumstances calling into question its accuracy or validity. Accordingly, the fact that the record was bare as to whether the government made the "requisite investigation" with county or state law enforcement authorities to determine whether the state would prosecute the defendant before it certified that position did not compel the conclusion that the district court lacked jurisdiction.

The panel held that § 2241 is not unconstitutionally vague in providing for arbitrary and discriminatory enforcement when both the victim and the perpetrator are under the age of twelve, and does not violate principles of notice within due process.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the district court did not err in applying the mens rea element of § 2241(c) because the statute does not require that there be knowledge of the sexual nature of the act. The panel held that the district court did not err in denying a motion for judgment of acquittal as to two counts alleging anal penetration. The district court also did not err in admitting the hearsay statements of a victim through the testimony of a social worker for medical diagnosis and treatment.

The panel held that the district court erred in denying the defendant's requests to suspend his status as a juvenile delinquent under Federal Rule of Criminal Procedure 35(a). The panel held that the district court lacked jurisdiction to issue its order denying the defendant's motion because Rule 35(a)'s fourteen-day time limit had expired. The panel held that the district court abused its discretion in not suspending the determination of delinquency at the defendant's disposition hearing because the record did not show that the court weighed factors bearing on suspension.

Judge Berzon concurred in the majority opinion with regard to jurisdiction, sufficiency of the evidence, and the evidentiary issue. She also concurred in the decision to remand with respect to the delinquency finding, but unlike the majority, she concluded that the only proper outcome on remand would be suspension of the delinquency determination due to the defendant's age and circumstances, the dire possible consequences for his future in light of the recent proliferation of sexual offender registration statutes, and the lack of prosecutorial guidance provided by § 2241(c) as applied to a child offender himself under twelve years old.

**COUNSEL**

Keith J. Hilzendeger, Federal Public Defender's Office, Phoenix, Arizona, for Defendant-Appellant.

Bruce M. Ferg, Assistant United States Attorney, Office of the United States Attorney, Tucson, Arizona, for Plaintiff-Appellee.

**OPINION**

ALARCÓN, Circuit Judge:

JDT, a juvenile, appeals from the district court's adjudication of delinquency on six counts of aggravated sexual abuse, in violation of 18 U.S.C. § 2241(c), for incidents occurring with four boys between the ages of five and seven in Fort Huachuca, Arizona. We first review whether the district court had subject matter jurisdiction over JDT's juvenile delinquency proceedings pursuant to 18 U.S.C. § 5032, and whether 18 U.S.C. § 2241(c) is unconstitutionally vague because it provides for arbitrary and discriminatory enforcement when both the victim and the perpetrator are under the age of twelve. We conclude that the district court had jurisdiction and that § 2241(c) is not unconstitutionally vague.

JDT further contends on appeal that the district court erred (1) applying the *mens rea* element of § 2241(c); (2) denying the Rule 29 motion for judgment of acquittal as to Counts 3 and 5 because there was insufficient evidence of anal penetration; (3) admitting the hearsay statements of a victim through the testimony of a social worker pursuant to

Rule 803(4) of the Federal Rules of Evidence for medical diagnosis and treatment; and (4) denying JDT's requests to suspend his status as a juvenile delinquent. We find error only with respect to the district court's handling of JDT's suspension request, and accordingly vacate the district court's disposition decision and remand for further proceedings. We affirm in all other respects.

# I

JDT was charged by the Government with sexually abusing five boys (E.F. (age 5), C.T. (age 7), C.M. (age 5), N.S. (age 6), and C.B (age 6)) in and around Mott Circle, a residential neighborhood for military families in Fort Huachuca, Arizona, between June 1, 2010, and December 14, 2010. The housing units in Mott Circle surround a park with a playground. A large drainage ditch with a cement tunnel forms part of the perimeter of the neighborhood. JDT was ten years old at the time of the alleged federal crimes.

On February 10, 2011, the Government filed an Information charging JDT with six counts of violating § 2241(c) and a certification to proceed against JDT as a juvenile in federal court pursuant to 18 U.S.C. § 5032, as required under the Juvenile Justice and Delinquency Prevention Act of 1974, §§ 5031 *et seq.*, referred to herein as the Federal Juvenile Delinquency Act ("FJDA").[1] The Government filed a Superseding Information on March 1, 2011, charging JDT with two additional counts. JDT was thus charged with four counts of violating § 2241(c) and § 2246(2)(B) (aggravated sexual abuse of a minor involving

---

[1] Unless otherwise noted, all federal statutory references are to Title 18 of the United States Code.

contact between the penis and mouth (Counts 1, 2, 4, and 6)); three counts of violating § 2241(c) and § 2246(2)(A) (aggravated sexual abuse of a minor involving contact between the penis and anus (Counts 3, 5, and 7)); and one count of violating § 2244(a)(5) and § 2246(3) (abusive sexual contact (Count 8)). The Government's certification to proceed against JDT as a juvenile in federal court pursuant to § 5032, filed March 1, 2011, stated that

> the juvenile court or the state does not have jurisdiction over the juvenile with respect to the alleged act of juvenile delinquency; that the offense charged is a crime of violence; and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction.

At a hearing in district court on March 9, 2011, JDT's counsel, Richard Raynor, objected to the Superseding Information as follows:

> Mr. Raynor:     Your Honor, the superseding information I would object to because it lacks jurisdiction because there's no certification for the additional charges that are added. There's no new certification for the additional charges that are added. There's no new certification by the U.S. Attorney himself who is delegating - -

Government: I'm sorry. I probably just didn't give him that piece of paper.

The Court: You know, I signed this information and it's my recollection but - -

Government: You know, I just have it in the copies I have and it wasn't attached but Dennis Burke did sign.

The Court: I believe, because I looked at that, and I believe that there was a certification and perhaps counsel can get a copy of that. And if somehow it turns out to be incorrect, file your motion and we'll come back and revisit that. My recollection is - - because I look for that sort of thing and I believe there was a certification.

Mr. Raynor: Okay. Thank you, Your Honor. And, You Honor, as the Court knows, jurisdiction as an issue could be raised at any time. I just raised it at this moment.

The Court: That's fine and the record will reflect that you have objected.

> And if it turns out that my recollection is incorrect, then I guess you'll be able to move forward on that. But I think since I signed the information, I look for that and I believe that I did see it.

Government: I'm handing him a copy, Judge.

JDT did not raise any further challenges to the federal court's jurisdiction generally, or the validity of the Government's certification specifically, while proceedings were pending in the district court.

During a three-day bench trial, testimony revealed that the offenses occurred either in and around a "ditch," (Counts 1, 2, 3 & 6), or in a vacant house (Counts 4 & 5), near Mott Circle where JDT and the victims resided.

Count 1: At trial, E.F. (age 5) testified that on December 14, 2010, he "sucked [JDT's] pee-pee" "[b]ecause [JDT] said" to; JDT said to "not stop" and he continued; although he wanted to go home, JDT said he "was going to hit [E.F.] with a stick" if E.F. stopped. C.T. testified that he witnessed the incident and that JDT "told [E.F.] to suck [JDT's] penis"; that JDT told him that if C.T. tried to leave the ditch, "he was going to throw this little square thing that's sharp" at someone's head, and "they would die"; and C.T. thought someone would actually die if hit with the object.

Counts 2 and 3: C.T. (age 7) testified that one time when he was alone with JDT in the ditch, JDT "made me suck his

penis, and then he sticked his private parts in my behind"; and when JDT put his penis in C.T.'s butt, it was "pretty soft" like when it was in his mouth. When asked, "Where did [JDT] put his penis?," C.T. answered JDT put his penis "[l]ike, straight in the hole of it."

Counts 4 and 5: C.M. (age 5) testified that JDT took him to an empty house on Mott Circle and told him, "Don't worry"; JDT put his "pee-pee" in C.M.'s "mouth," and in his "butt"; he took his pants off and was "lying down" on his stomach facing the wall, and that JDT was "right on top of [him]," also with his pants off; JDT stopped "[b]ecause he was done doing it." When asked, "Were you ever afraid of [JDT]?," C.M. replied, "No."

Count 6: N.S. (age 6) was asked three times if JDT ever put his penis in his mouth, and each time he answered "No." He testified JDT hurt him when "[h]e pulled down my pants[, but] he didn't put his penis in my mouth." At no point did N.S. say that JDT put his penis in N.S.'s mouth or anus. N.S.'s mother testified that her son disappeared with JDT and when she asked him what happened, N.S. told her that JDT had him pull down his pants and touched N.S. on the butt. She asked him to show her what JDT did and he "crawled up on to the bed, on top of [her] lap and jumped up and down in a missionary position." Judy Pike, a social services counselor at Fort Huachuca Medical Clinic, testified that she met with N.S. and he told her that JDT led him into an empty house and told N.S. to touch JDT's privates, "to put his mouth on [JDT's] private." JDT's counsel objected to the introduction of these hearsay statements to Pike. Defense counsel argued that the testimony "doesn't fit within the hearsay" exception for medical diagnosis or treatment, but instead was for law enforcement purposes. The district court concluded, "I am

going to conditionally allow Ms. Pike to testify, and I will make my ultimate decision once I hear from her what was really going on and how she really got involved in this case." The district court ultimately overruled the hearsay objection.

Counts 7 and 8: The testimony the Government elicited from N.S. and C.B. with respect to these charges was apparently insufficient to prove these counts, because at the conclusion of the Government's case-in-chief, Counts 7 and 8 of the Superseding Information were dismissed on the Government's motion.

JDT called Alfredo Guevara, MD, a board-certified urologist, who testified that he performed a complete examination of JDT, and JDT's lab tests revealed "[z]ero level of testosterone"—meaning an undetectable level of testosterone—in JDT's bloodstream. The Government called Dale Woolridge, MD, an associate professor of pediatrics and emergency medicine at the University of Arizona. Both doctors testified that it was possible for prepubescent boys to get an erection.

In Dr. Guevara's view, the "erections of a child that . . . has not gone through puberty can only occur as a reflex." When asked if it was impossible for a reflex erection to be used for sexual activity, he testified, "I don't think so. In order for one to perform a sexual act, a reflex erection has to be maintained. And by nature, . . . a reflex erection is nonmaintainable." They occur "usually under REM sleep in older boys."

Dr. Woolridge testified that prepubescent boys experienced both reflex erections and erections that are "voluntary based on pleasure." He explained that infants

"routine[ly]" have erections during medical examinations, and that "it's not uncommon" to examine the testicular size of an infant or prepubescent boy and "actually stimulate an erection." He did not characterize these erections as "reflex" but instead as "spontaneous" results of stimulation. Dr. Woolridge "disagree[d] wholeheartedly" with Dr. Guevara's view that a ten- or eleven-year-old boy can only get a reflex erection during sleep. Dr. Woolridge testified that "an awake child . . . is able to develop an erection" during a medical examination. He added that "it's [] common knowledge throughout the pediatric literature that prepubescent children can get erections," and that they can happen in such children "spontaneously and with stimulation."

Both doctors also agreed that testosterone was required for a postpubescent male to manifest sexual intent through an erection. Dr. Guevara stated that it was "a physical, scientific impossibility for [JDT] to will an erection for sexual intent." Dr. Guevara pointed out that serum testosterone is required to experience a sexual urge and to perform a sexual act. However, Dr. Woolridge testified that "[a]cts of aggression and acts of domination are essentially learned behaviors . . . . [and t]hey may have a sexual form or a sexual outlet." Dr. Woolridge asserted that, before the onset of puberty, testosterone is not necessary for a boy to get an erection, even an intentional one, because a prepubescent boy can get an erection "with stimulation" "akin to tickling."

Dr. Guevara testified that "[i]t is impossible to penetrate an anus with an unerect penis . . . . [A] soft penis is not erect and, therefore, unable to penetrate." Dr. Woolridge testified that it was not "impossible for the anus of a child [to] be penetrated by a penis that is flaccid." When asked if there is a different type of erection between someone who is pre- or

post-pubescent, he said, "I would say no. I would say an erection is an erection. It's the engorged shaft of the penis. It's the tumescent state of the penis."

The district court found JDT to be a delinquent based on the evidence provided by the Government on Counts 1–6. It ordered that JDT be evaluated by a physician prior to disposition. On December 12, 2011, the district court held a disposition hearing. The Government requested placement in a facility called Casa de Tucson because JDT "is not being monitored properly at school, which he would be if at Casa de Tucson" and that JDT "committed these crimes while living in []his home environment, which fostered this child's behavior." JDT asked the district court to impose three years' probation to allow for continuing treatment of JDT in his home. The guardian *ad litem* opined that placement at a facility like the Casa de Tucson treatment facility was inappropriate for a child like JDT.

The district court stated:

- "I grew up in a system called progressively increasing consequences. If I start with Casa de Tuscon, I've got no place else to go."

- "I'm going to start out by leaving [JDT] in the house, and I want to explain to you why I'm going to do it."

- "So I think it's in [JDT's] best interests to give him a shot at home with probation doing some major supervision, some major counseling being done."

- "My goal right now is not to make things worse than they already are. He's 11 going on 12 chronologically, but he's closer to seven or eight with his mental status, at least educationally testing."

- "Besides the fact that he'd be the youngest one there, generally speaking, taking someone to a facility such as Casa de Tucson or [other inpatient facilities], there is no surefire way of getting the desired result, and sometimes we make things worse."

The district court placed JDT on probation for five years and, as recommended by the guardian *ad litem*, remanded him to the custody of his parents. The district court imposed a number of restrictions as part of JDT's probation also as recommended by the guardian *ad litem*, including restrictions on internet access and movies carrying an MPAA rating of PG-13 or greater, a 6:00 p.m. curfew, that he be supervised by an adult at all times when around children, take his medication, and participate in weekly individual and family therapy.

JDT asked the district court to suspend the finding of delinquency because the determination would "brand [JDT] for the rest of his life as a sex offender, . . . [and] would be contrary to the purposes of rehabilitation." The district court asked defense counsel "[w]hat state law are you aware of right now . . . would require him to register [as a sex offender] for the rest of his life?" Defense counsel responded: "I'm not aware of any right now." (One week later in his Rule 35(a) Motion, JDT identified thirty-four

states in which juveniles adjudicated delinquent may be subject to certain registration requirements for certain periods of time.) Later in the disposition hearing, defense counsel again inquired about suspension, asking whether the district court "has made a decision or not to suspend the finding of delinquency." The district court stated, "I haven't decided whether to make that decision or not. He's definitely delinquent. I can't suspend the fact that he's delinquent. He's the poster child for being delinquent. We'll talk about the legal niceties later."

JDT filed a motion to correct the sentence pursuant to Rule 35(a) of the Federal Rules of Criminal Procedure. The district court denied the motion to correct the sentence explaining:

> The Court has reviewed the pleadings filed by the parties with regard to the request by the juvenile to "suspend" his conviction. The Court, after doing some basic research of the statute, the term "suspend" is not defined or explained and due to the gravity of the nature of these charges, the Court declines to grant the Motion to Correct Sentence.

JDT filed a timely notice of appeal.

## II

JDT argues on appeal that the district court lacked jurisdiction over these delinquency proceedings because the Government did not present a valid certification as to the need for these juvenile proceedings to take place in federal court. The Government maintains that a facially valid

certification is not subject to review by this Court and must be held sufficient. It further contends that even if the certification can be reviewed by this Court, the certification at issue here was correct. "Whether the government complied with [the juvenile delinquency certification requirements of] 18 U.S.C. § 5032 is an issue of statutory interpretation which this court reviews de novo." *United States v. Juvenile Male*, 241 F.3d 684, 686 (9th Cir. 2001). A certification filed in the district court by a United States Attorney is presumed to be accurate, absent circumstances calling into question its accuracy or validity. *See Pasadena Research Labs., Inc. v. United States*, 169 F.2d 375, 381–82 (9th Cir. 1948) (holding generally, the law "presumes[] that every man, in his private and official character, does his duty, until the contrary is proved; it will presume that all things are rightly done, unless the circumstances of the case overturn this presumption").

## A

Section 5032 provides in relevant part:

> A juvenile alleged to have committed an act of juvenile delinquency . . . shall not be proceeded against in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that (1) the juvenile court or other appropriate court of a State does not have jurisdiction or refuses to assume jurisdiction over said juvenile with respect to such alleged act of juvenile delinquency, (2) the State does not have available programs and services adequate for the needs of juveniles, or (3) the offense

> charged is a crime of violence that is a felony
> or [one of several enumerated crimes] and that
> there is a substantial Federal interest in . . . the
> offense to warrant the exercise of federal
> jurisdiction.

18 U.S.C. § 5032. "Regulations promulgated by the Department of Justice delegate authority to sign need certifications to the Assistant Attorney General for the Criminal Division and his Deputy Assistant Attorneys General, who may in turn delegate to the U.S. Attorneys." *Juvenile Male*, 241 F.3d at 686 (citing 28 C.F.R. § 0.57). The statute and related regulations therefore require that the United States Attorney, as the Attorney General's delegated representative, investigate and certify to the district court that federal jurisdiction is appropriate based on one of the enumerated reasons listed in § 5032.

"Because certification requirements are disjunctive, a single basis for certification establishes jurisdiction." *United States v. Male Juvenile*, 280 F.3d 1008, 1013 (9th Cir. 2002).

**B**

JDT contends that the Government's certification was legally incorrect because it stated that "the juvenile court or the state does not have jurisdiction over the juvenile with respect to the alleged act of juvenile delinquency," when in fact "Arizona's juvenile courts assert concurrent jurisdiction in cases like this one." The Government argues that the certification correctly stated "that the Arizona courts lacked jurisdiction" since no state court proceedings had been initiated against JDT. Furthermore, the Government argues that where Congress has "'specified what the government

must do to establish jurisdictional preconditions,' and the proper government official has so certified, this Court 'should not . . . read into the statute an unwritten additional hurdle."

This Court addressed a similar certification challenge in *United States v. Gonzalez–Cervantes*, 668 F.2d 1073 (9th Cir. 1981). There, the United States Attorney filed a timely certification that stated that the juvenile court of San Diego County refused to assume jurisdiction over Gonzalez–Cervantes, rather than the juvenile court of Imperial County—where the underlying crimes occurred. "In an attempt to remedy any error, the government, as an appendix to its briefs, filed a certification stating that the Imperial County courts refused to assume jurisdiction over Doe." *Id.* at 1077 n.6. This Court "note[d] that the defendant made no objection to the certification at the trial court level," and in fact, "stated to the district court: 'the appropriate certification was filed stating that the State court did not wish jurisdiction over Mr. (Doe).'" *Id.* at 1078. "The general rule is that a party must object to an error at the first opportunity, or that error is waived." *Id.* (citing Fed. R. Crim. P. 51).

This Court noted that "[d]efense counsel was aware that the certification[] stated that San Diego County courts refused to assume jurisdiction . . . [and] had access to the facts showing that the criminal activity occurred in Imperial County. Thus, any objection to the error in the certification should have been made to the district court judge at the earliest opportunity." *Id.*

Accordingly, this Court rejected Gonzalez–Cervantes's argument and held that

the statute does not require the trial judge to determine, *sua sponte*, if the certificate filed refers to the appropriate state court before instituting binding proceedings against the juvenile. Where, as here, a certificate was timely filed, and that certificate appeared regular on its face, the trial judge has no duty independently to investigate and determine if the certificate refers to the proper state court. Moreover, not only did defense counsel fail to object to the certification, she agreed that it was "appropriate." We believe that the trial judge can rely on the representations by the United States Attorney, particularly in the face of acquiescence by defense counsel, that the certification is accurate. The district court judge is then free to proceed against the juvenile.

*Id*. at 1077–78 (footnote omitted).

JDT argues that unlike in *Gonzalez–Cervantes*, where the Government presented evidence with its briefs on appeal that it investigated with the proper state authorities to determine whether they intended to prosecute, the Goverment here "makes no effort [to address the investigation requirement] before this Court." JDT's attempt to distinguish this case from *Gonzalez–Cervantes* is not persuasive.

The record supports JDT's assertion that the Government has not provided any additional support—beyond the certification it filed in the district court—demonstrating that it investigated whether the state intended to assume jurisdiction over JDT's offenses. As this Court held in

*Gonzalez–Cervantes*, however, "any objection to the error in the certification should have been made to the district court judge at the earliest opportunity." *Gonzalez–Cervantes*, 668 F.2d at 1078. While counsel for JDT objected to the district court's jurisdiction on the ground that the Government failed to file a § 5032 certification corresponding with its Superseding Information filed on March 1, 2011, the record reflects that JDT was provided with a copy and then dropped the objection, despite the district court's express invitation to file a motion objecting to the certification. JDT did not raise the issue again and at no point articulated the specific objections to the certification that are now being raised for the first time on appeal.

Moreover, the statute only requires that the United States Attorney certify that "the juvenile court or other appropriate court of a State does not have . . . or refuses to assume jurisdiction over [the acts of a juvenile]." § 5032. Black's Law Dictionary defines "certify" as follows: "1.    To authenticate or verify in writing.  2.    To attest as being true or as meeting certain criteria." Black's Law Dictionary 258 (9th ed. 2009). Here, the United States Attorney certified to the district court that "the juvenile court or the state does not have jurisdiction over the juvenile with respect to the alleged act of juvenile delinquency no state court had jurisdiction." This Court has held that "there are certain well-established presumptions regarding the regularity . . . of the acts of public servants." *Pasadena Res. Labs., Inc.*, 169 F.2d at 381–82 ("The presumption of regularity supports the official acts of public officers, and in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14 (1926))). Accordingly, the fact that the record is bare as to whether the Government made the

"requisite investigation" with county or state law enforcement authorities to determine whether the state would prosecute him before it certified that position does not compel the conclusion that the district court lacked jurisdiction.

This holding is consistent with decisions in other certification contexts. For example, this Court has held that the certification provision in 18 U.S.C. § 3731, which conveys appellate jurisdiction over certain interlocutory matters and requires that the United States Attorney certify "to the district court that the appeal is not taken for purpose of delay and that the evidence is . . . material," is satisfied by "mere certification regarding the delay and materiality prerequisites." *United States v. W.R. Grace*, 526 F.3d 499, 505 (9th Cir. 2008) (en banc). Where Congress has specified "what the government must do to establish those jurisdictional preconditions . . . . we should not . . . read into the statute an unwritten additional hurdle, even if well intentioned." *Id.* This Court held that "the plain language of the statute shows that Congress intended that, as long as the other requirements of § 3731 are present, mere certification regarding the delay and materiality prerequisites is all the statute requires to invoke our appellate jurisdiction." *Id.* "The certification itself is a representation by the United States Attorney, as an officer of the court, that the appeal is not for purposes of delay and that the suppressed evidence is indeed material." *Id*. at 507. "[S]hould we find the government's appeal to be patently frivolous or have reason to believe its certification is false, we could directly sanction such misconduct, surely a potent 'check' on prosecutorial abuse of the certification process." *Id*.

The Government's representation is presumed to be accurate, "until the contrary is proved . . . [or] unless the

circumstances of the case overturn the presumption." *Pasadena Res. Labs.*, 169 F.2d at 381–82. JDT did not challenge that representation or present any evidence that would overturn the presumption of its correctness at the district court level. Accordingly, we hold that the district court had jurisdiction over JDT's juvenile delinquency proceedings.

Because a single basis for certification establishes jurisdiction, we do not reach the merits of any of JDT's other arguments concerning the validity of the Government's certification. *Male Juvenile*, 280 F.3d at 1013.

## III

JDT argues on appeal that § 2241(c) is unconstitutionally vague within the meaning of the Due Process Clause of the Fourteenth Amendment because it fails to clarify what is contemplated in cases where all participants in the sexual acts charged are under the age of twelve. He argues that § 2241(c) operates as a federal statutory rape provision, under which an adult or teenager who engages in a sexual act with a person under the age of twelve is the "natural target of prosecution" and the child is the victim. He argues, however, that "when two children under the age of 12 engage in a sexual act together, 'each child is both an offender and a victim, and the distinction between those two terms[, offender and victim,] breaks down.'" Accordingly, he contends that § 2241(c) is void for vagueness because it "encourages arbitrary and discriminatory enforcement" when used to prosecute one child under the age of twelve for sexual acts performed with another child under the age of twelve.

JDT also argues that the statute did not adequately inform him that he could be prosecuted for knowingly engaging in a sexual act with a person under the age of 12, because he falls into the class of persons that the statute is intended to protect. He contends that "Congress did not intend for the statutory-rape provision to be used to prosecute a 10-year-old prepubescent boy for knowing conduct, and that the trial prosecutor arbitrarily disregarded Congress's intention."

The Government maintains that JDT's "unguided enforcement" claim is barred because JDT's actions "'clearly come within the statute.'" Alternatively, the Government argues that even if JDT's challenge is permissible, only statutes that "invite" arbitrary enforcement are unacceptably vague. The Government asserts that § 2241(c) provides clear notice to potential offenders as to what conduct is forbidden and also provides constitutionally sufficient guidance for law enforcement. The Government concedes, however, that there are no reported cases of delinquency proceedings having been brought against other juveniles under the age of twelve for violating § 2241(c), while noting that "young juveniles are subject to such proceedings."

JDT's vagueness claim was not raised in the district court. This Court "review[s] de novo a defendant's challenge that a statute is unconstitutionally vague." *United States v. Lee*, 183 F.3d 1029, 1031 (9th Cir. 1999) (citing *United States v. Iverson*, 162 F.3d 1015, 1021 (9th Cir. 1998)).

To satisfy due process, "a penal statute must define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling v. United States*, 561 U.S. 358,

402–03 (2010) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)) (brackets omitted).  "The void-for-vagueness doctrine embraces these requirements." *Id.* at 403.  The legislature must provide "minimal guidelines to govern law enforcement" and "[w]here the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Kolender*, 461 U.S. at 358 (quoting *Smith v. Goguen*, 415 U.S. 566, 575 (1974)).  "[T]he Government retains 'broad discretion' as to whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607 (1985) (quoting *United States v. Goodwin*, 457 U.S. 368, 380 n.11 (1982)).  "So long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Id*. (citing *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)) (brackets omitted).  In *Wayte* the Supreme Court explained:

> This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review.  Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.

*Wayte*, 470 U.S. at 607.

## A

JDT contends that "[i]n light of the undisputed testimony at the delinquency hearing that [his] body had not yet begun to produce testosterone," there is "vagueness inherent in prosecuting a 10-year-old boy under" a statute that identifies children of his age a "protected party." In light of this vagueness in the statute, "the delinquency proceedings in this case amount to an arbitrary exercise of prosecutorial power."

Cases assessing whether a statute allows arbitrary and discriminatory enforcement consider unguided enforcement based on vagueness in the text of the statute. In *Kolender*, the Supreme Court reviewed a California criminal statute that "require[d] persons who loiter or wander on the streets to provide a 'credible and reliable' identification and to account for their presence when requested by a peace officer under circumstances that would justify a [*Terry*] stop." 461 U.S. at 353. The statute was challenged because it "vest[ed] virtually complete discretion in the hands of the police to determine whether the suspect ha[d] satisfied the statute." *Id.* at 358. The Court noted that "as presently drafted and construed . . . , [the statute] contains no standard for determining what a suspect has to do in order to satisfy the requirement to provide a 'credible and reliable' identification." *Id.* At oral argument, it was conceded that "a suspect violates [the statute] unless 'the officer is satisfied that the identification is reliable.'" *Id.* at 360 (brackets omitted). The Court reasoned the statute "furnish[ed] a convenient tool for harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure." *Id.* (internal quotation marks omitted). The Court held the statute was "unconstitutionally vague . . . because it encourage[d] arbitrary enforcement." *Id.* at 361.

Similarly, in *City of Chicago v. Morales*, 527 U.S. 41 (1999), the Court examined an ordinance that prohibited "'criminal street gang members' from 'loitering' with one another or with other persons in any public place." *Id.* at 45–46. Loitering was defined as "'remaining in any one place with no apparent purpose.'" *Id.* at 47 (brackets omitted). The Court noted that "[t]he 'no apparent purpose' standard . . . is inherently subjective because its application depends on whether some purpose is 'apparent' to the officer on the scene." *Id.* at 62. "Presumably an officer would have discretion to treat some purposes—perhaps a purpose to engage in idle conversation or simply to enjoy a cool breeze on a warm evening—as too frivolous to be apparent if he suspected a different ulterior motive." *Id.* The statute was held to be unconstitutional because it "afford[ed] too much discretion to the police." *Id.* at 64.

JDT relies on *In re D.B.*, 950 N.E.2d 528 (Ohio 2011), *cert. denied sub nom.*, *Ohio v. D.B.*, 132 S. Ct. 846 (2011), in support of his argument that § 2241(c) authorizes and encourages arbitrary and discriminatory enforcement when applied to offenders under the age of 12. There, "A.W. [age 12] testified that he had observed D.B. [age 12] and M.G. [age 11] engage in anal sex." *Id*. at 530. "A.W. testified that D.B. 'bribed' M.G. with video games to engage in sexual conduct. Both A.W. and M.G. stated that the sexual conduct was always initiated by D.B. and that D.B. would either bargain with, or use physical force on, M.G. to convince M.G. to engage in sexual conduct." *Id.* D.B was adjudicated to be delinquent and committed "to the Department of Youth Services for a minimum of five years to the maximum period of his 21st birthday." *Id.* The court "suspended the commitment, and placed D.B. on probation for an indefinite

period of time." *Id.* at 530–31. The disposition was affirmed on appeal. *Id.* at 531.

The Ohio Supreme Court, however, held that a state statute "criminaliz[ing] what is commonly known as 'statutory rape,'" *id.*, was "unconstitutional[ly vague] as applied in these circumstances," *id.* at 529. The statute under review "h[e]ld offenders strictly liable for engaging in sexual conduct with children under the age of 13 [and] force [was] not an element of the offense because a child under the age of 13 is legally presumed to be incapable of consenting to sexual conduct." *Id.* at 531. D.B. argued that the statute was "unconstitutional as applied to him because it fail[ed] to provide guidelines that designate which actor is the victim and which is the offender, resulting in arbitrary and discriminatory enforcement." *Id.* at 532. The Ohio Supreme Court agreed:

> As applied to children under the age of 13 who engage in sexual conduct with other children under the age of 13, [the statute] is unconstitutionally vague because [it] authorizes and encourages arbitrary and discriminatory enforcement. When an adult engages in sexual conduct with a child under the age of 13, it is clear which party is the offender and which is the victim. But when two children under the age of 13 engage in sexual conduct with each other, each child is both an offender and a victim, and the distinction between those two terms breaks down.

*Id.* at 533.  The court explained that "while the theory of D.B. as the aggressor was consistent with the counts alleging [forcible rape, all of which were dismissed], this theory is incompatible with the counts alleging a violation of statutory rape because anyone who engages in sexual conduct with a minor under the age of 13 commits statutory rape regardless of whether force was used."  *Id*.  "Thus, if the facts alleged in the complaint were true, D.B. and M.G. would both be in violation of [the statutory rape statute]."  *Id.*  The Ohio Supreme Court held that "[t]he prosecutor's choice to charge D.B. but not M.G. is the very definition of discriminatory enforcement.  D.B. and M.G. engaged in sexual conduct with each other, yet only D.B. was charged."  *Id.*  "The facts of this case demonstrate that [the statutory rape law] authorizes and encourages arbitrary and discriminatory enforcement when applied to offenders [who are both] under the age of 13.  The statute is thus unconstitutionally vague [in violation of the Due Process Clause of the United States Constitution] as applied to this situation."  *Id.*

The Government argues that *In re D.B.* "is a meritless aberration."  *But see In re D.R.*, No. 12 MA 16, 2012 WL 5842773, at *6 (Ohio Ct. App. Nov. 14, 2012) (affirming juvenile court's dismissal of proceedings against eleven-year-old charged with statutory rape of a four-year-old pursuant to the ruling in *In re D.B.*).  It maintains that there are "many explanations for differential prosecution" and that charging JDT instead of the other children is part of prosecutorial discretion and does not stem from the vagueness of the statute itself.  "Congress intended that law enforcement discretion about who to view as the offender when under-12 children have sex together be guided by common sense consideration such as who initiated the activity, their respective ages of the parties, and whether the conduct was factually voluntary."

The Government cites to *Juvenile*, 347 F.3d at 783–84, in support of its argument that prosecutors look to the "older, more mature person" to determine whom to prosecute as "more culpable and prosecution-worthy."

Section 2241(c) provides: "Whoever . . . knowingly engages in a sexual act with another person who has not attained the age of 12 years . . . shall be fined . . . and imprisoned." § 2241(c).  Unlike in *Kolender* and *Morales*, where it was unclear which individuals would be prosecuted because enforcement officials could determine who was in violation of the statute in an *ad hoc* manner, here, the plain language of § 2241(c) brings within its prohibition any person who knowingly engages in a "sexual act," as defined elsewhere in the statute, and is not susceptible to the same discretionary determinations as those in *Kolender* and *Morales*.  *See Kolender*, 461 U.S. at 358; *Morales*, 527 U.S. at 62.  Accordingly, § 2241(c) is not unconstitutionally vague under the Due Process Clause of the United States Constitution.

**B**

JDT also argues that § 2241(c) did not "adequately inform[] him that he, a prepubescent boy, can be subject to prosecution for knowingly engaging in a sexual act with a person under the age of 12, because both he and the other participants in the sexual act . . . fall into the class of persons that the statute is intended to protect."  The Government counters that the statute is quite clear because "Section 2241(c) states that '*Whoever*,' within federal jurisdiction, 'knowingly engages in a sexual act with another person who has not attained the age of 12 years,' shall be punished."  There is no exception based on the age of the perpetrator

provided under the text of the statute. The Government argues that "'[w]here the statute contains inclusive terms, such as 'any person' or 'whoever,' courts have generally concluded that the statute is applicable to any and all offenders including minors.'"

"Living under a rule of law entails various suppositions, one of which is that '[all persons] are entitled to be informed as to what the State commands or forbids.'" *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939)). "A statute is unconstitutionally vague . . . if it failed to put a defendant on notice that his conduct was criminal." *United States v. Kilbride*, 584 F.3d 1240, 1257 (9th Cir. 2009) (citing *United States v. Purdy*, 264 F.3d 809, 811 (9th Cir. 2001)). "A criminal statute is not vague if a reasonable person of ordinary intelligence would understand what conduct the statute prohibits." *United States v. Lee*, 183 F.3d 1029, 1032 (9th Cir. 1999). When reviewing a statute for vagueness, "a challenged statute enjoys a presumption of constitutionality." *Forbes v. Napolitano*, 236 F.3d 1009, 1012 (9th Cir. 2000) (citing *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)).

The text of § 2241(c) clearly expresses that any person who commits the listed acts is subject to prosecution, regardless of his or her age, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute." *Bordenkircher*, 434 U.S. at 364. JDT points to no "text" of § 2241(c) that is vague or ambiguous. The statute clearly defines what conduct is prohibited and delineates who may be charged with such conduct. Accordingly, it is is not unconstitutionally vague and does not violate principles of notice within due process.

**IV**

JDT contends that the district court erred when it denied his motion for judgment of acquittal because there was insufficient evidence to support a finding of juvenile delinquency. He maintains that the district court applied an incorrect legal standard to § 2241(c)'s *mens rea* requirement of "knowingly" engaging in a sexual act with another person. He asserts that § 2241(c) requires that he know the "sexual nature of the acts" and that because he undisputedly had zero testosterone, he was incapable of having a sexual motivation. Accordingly, he argues, there was insufficient evidence that he knowingly engaged in a sexual act with a person younger than twelve years old.

The Government contends that knowingly "'merely requires proof of knowledge of the facts that constitute the offense.'" It asserts that the statutory term "sexual . . .does not pertain to the quality of the defendant's understanding or his intentions while acting—only to the kind of acts done." It argues that if Congress intended to require a different mental state, it would have included a different mental state like it did in 18 U.S.C. § 2246(2)(C), (D), where it required the intent to "arouse or gratify the sexual desire of any person." We review the interpretation of a statute de novo. *United States v. Patel*, 762 F.2d 784, 791 (9th Cir. 1985) (citing *United States v. Wilson*, 720 F.2d 608, 609 n.2 (9th Cir. 1983)). We review the sufficiency of the evidence presented at a bench trial de novo. *United States v. Jiang*, 476 F.3d 1026, 1029 (9th Cir. 2007) (citing *United States v. Naghani*, 361 F.3d 1255, 1261 (9th Cir. 2004)). A conviction must be affirmed if "'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond

a reasonable doubt.'" *United States v. Maggi*, 598 F.3d 1073, 1080 (9th Cir. 2010) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

## A

At the conclusion of the Government's case in chief, JDT orally moved for judgment of acquittal pursuant to the Federal Rule of Criminal Procedure Rule 29. JDT argued there was insufficient evidence of anal penetration to support a conviction under Count 5. The district court stated, "I'll check my notes, but right now I'll deny the motion." During closing argument, the district court asked whether the Government would "address the intent aspect," or *mens rea* required of § 2241(c). The Government said, "I mean, luckily you don't have to prove intent in this case." The district court asked, "You have to prove it was at least knowingly, don't you?" The Government responded:

> I have to just prove that it happened. I don't have to prove any sexual intent. I have to prove that he—I mean, I guess I can't prove that he was spasming when it happened, but I certainly—I have to prove that the defendant knowingly engaged in a sexual act. . . . And what's a sexual act is just defined as . . . penis in the mouth and penis in the anus . . . I don't have to prove [JDT's] motives at all. I just have to prove it happened.
>
> [W]e don't have to prove any sexual motive. We don't have to prove that he knew this is what this means. We just have to prove that it

was done. . . . Did he know what he was doing?  Yes.

**B**

"In interpreting statutes, we begin with the language of the statute itself." *Coronado-Durazo v. INS*, 123 F.3d 1322, 1324 (9th Cir. 1997) (citing *Almero v. INS*, 18 F.3d 757, 760 (9th Cir. 1994)).  "The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)).

Section 2241(c) prohibits "knowingly engag[ing] in a sexual act with another person who has not attained the age of 12 years."  18 U.S.C. § 2241(c). Section 2246(2) defines sexual act as

> (A) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight;

> (B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;

> (C) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or

(D) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person;

*Id.* JDT was determined to be a juvenile delinquent for performing sexual acts defined in parts (A) and (B). The plain meaning of the statute prohibits engaging in a sexual act, but "sexual" is not an adjective describing "act"; instead, it is a term, "sexual act," further defined in the statute as contact between a penis and the vulva/anus with penetration however slight or contact between the mouth and the vulva/penis/anus. A plain reading of this text does not require that there be knowledge, as JDT asserts, of the sexual nature of the act, because "sexual act" is a term of art defined under the statute.

Furthermore, as the Supreme Court explained in *Dixon v. United States*, 548 U.S. 1 (2006), "'unless the text of a statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense.'" *Id.* at 5 (quoting *Bryan v. United States*, 524 U.S. 184, 193 (1998)); *see also United States v. Crowder*, 656 F.3d 870, 874 (9th Cir. 2011) (explaining the term "knowingly" is "not a 'culpable state of mind' or 'knowledge of the law'" (quoting *Dixon*, 548 U.S. at 5)).

Applying the framework set forth in *Dixon* and *Crowder* to this case, the term knowingly does not require a culpable state of mind, but rather, knowledge of the facts underlying the offense. Here, "knowingly" only requires that JDT know he was putting his penis in the mouth or anus of another

child, as the Government correctly stated during closing argument. The district court applied the correct standard and had ample evidence before it that JDT, repeatedly, took young boys to secluded locations and directed them to commit sexual acts. JDT does not contend that he did not know what he was doing when he directed these children to put his penis in their mouths or allow him to put his penis in their anuses. A rational trier of fact could have found that JDT acted knowingly beyond a reasonable doubt. Accordingly, the district court did not err in denying JDT's Rule 29 motion for a judgment of acquittal on this ground.

JDT also contends that the Government was not held to its burden of proof to prove JDT acted knowingly because the district court conflated the *mens rea* and *actus reus* requirements of § 2241(c) when it said the "act of knowingly only means basically doing it." The discussion between the district court and the Government, however, demonstrates that the district court considered the *mens rea* requirement as separate from the *actus reus* requirement. Taking the district court's statements in context and relying on the conclusion above, that knowingly means JDT knew he was performing the acts that § 2241(c) proscribed, the district court did not conclude that the *actus reus* requirement satisfied the *mens rea* requirement of knowingly. Instead, the district court held that "knowingly" does not require a heightened understanding of one's actions. Therefore, the district court properly held the Government to its burden of proof.

## V

JDT contends that the Government presented insufficient evidence at trial to support a finding of juvenile delinquency under Counts 3 and 5, the charges alleging anal penetration

of C.T. and C.M.; that both victims testified that his penis was "soft" during the incidents, and that medical testimony "established that a flaccid penis is not capable of penetrating the anus;" and therefore there is not sufficient evidence that he committed aggravated sexual abuse pursuant to § 2241(c) and § 2246(2)(A).

The Government maintains that "'[s]oft' is a vague and comparative term, not necessarily excluding some degree of erection, and neither counsel specifically asked whether the defendant's penis was erect." It contends that its expert witness found it possible for a child's anus to be penetrated to some degree by a flaccid penis; and to the extent there is a dispute between the experts, the district court was entitled to find one expert more credible than the other.

We must view "the evidence, both direct and circumstantial, in the light most favorable to the prosecution." *United States v. Magallon-Jimenez*, 219 F.3d 1109, 1112 (9th Cir. 2000). Additionally, "[t]he reviewing court must respect the exclusive province of the fact finder to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *United States v. Hubbard*, 96 F.3d 1223, 1226 (9th Cir. 1996) (citing *United States v. Goode*, 814 F.2d 1353, 1355 (9th Cir. 1987)).

The evidence presented by the Government was sufficient for a rational trier of fact to have found the essential elements of the crime beyond a reasonable doubt. As this Court explained in *Hubbard*, it is the "exclusive province of the fact finder to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." 96 F.3d at 1226. In reviewing the conflicting testimony in a light most favorable to the prosecution, we can

infer that the district court found that Dr. Woolridge was more credible than Dr. Guevara.

Courts have found evidence sufficient to affirm determinations of a fact finder despite the "existence of some contradictory evidence in the record." *See, e.g.*, *United States v. Nevils*, 598 F.3d 1158, 1169 (9th Cir. 2010) (en banc) (finding evidence sufficient to support defendant's conviction despite testimony by defense witness negating element of the offense because "the jury[ was] entitle[d] to disbelieve her"); *United States v. Howard*, 454 F.2d 720, 721 (9th Cir. 1971) (per curiam) (affirming jury verdict despite defendant taking stand, directly contradicting Government witnesses, and introducing "circumstantial evidence which added considerable weight to his testimony"). Crediting Dr. Woolridge's testimony, and coupling it with the testimony of those victims who testified that they were anally penetrated by a "soft" penis, there was sufficient evidence for the district court to find that JDT violated § 2241(c) by penetrating the anuses of C.T. and C.M., however slightly. Accordingly, we uphold the district court's determination that JDT is delinquent under Counts 3 and 5.

## VI

JDT contends that the district court abused its discretion in admitting, pursuant to Rule 803(4) of the Federal Rules of Evidence, Judy Pike's testimony recounting N.S.'s statements that JDT put his penis in N.S.'s mouth. He asserts that "nothing in the record indicates that [N.S.]'s statements to clinical social worker Pike regarding the identity of the perpetrator were made for the purposes of medical treatment." Without this testimony, he maintains, there was insufficient evidence to support his determination of juvenile

delinquency under Count 6 because N.S. affirmatively denied having seen JDT's penis.

The Government argues that under *United States v. George*, 960 F.2d 97 (9th Cir. 1992), the identity of a perpetrator in a sexual abuse of a minor case falls within the medical diagnosis and treatment hearsay exception. It contends that in sexual abuse cases, there are emotional and psychological injuries and that the extent of those injuries may depend on the abuser. Accordingly, it asserts that there was no abuse of discretion in admitting Pike's testimony and, moreover, there is sufficient record evidence to support the district court's determination that JDT is delinquent under Count 6.

We "review for an abuse of discretion the district court's decision to admit evidence under a hearsay exception." *United States v. Pena-Gutierrez*, 222 F.3d 1080, 1086 n.3 (9th Cir. 2000). We apply a two-step test to determine whether a district court abused its discretion. First, we review de novo whether the district court "identified the correct legal rule to apply to the relief requested." *United States v. Hinkson*, 585 F.3d 1247, 1261–62 (9th Cir. 2009) (en banc). "If the [district] court failed to do so, we must conclude it abused its discretion." *Id.* at 1262. If the district court identified the correct legal rule, we will determine whether the court's "application of the correct legal standard was (1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" *Id.* (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 577 (1985)).

Pursuant to Rule 803(4) of the Federal Rules of Evidence, hearsay statements are admissible when made for medical

diagnosis or treatment. Fed. R. Evid. 803(4). "The advisory committee notes to Rule 803(4) observe that statements of fault will not ordinarily be admissible under the [medical examination] exception." *George*, 960 F.2d at 99. "However, other circuits have held that statements by a victim identifying her sexual abuser are admissible under the medical examination exception." *Id.* (citing *Morgan v. Foretich*, 846 F.2d 941, 948–50 (4th Cir. 1988), and *United States v. Renville*, 779 F.2d 430, 435–39 (8th Cir. 1985)). Relying on those cases, we have stated "[t]he critical inquiry is whether such statements are 'made for the purpose of medical diagnosis or treatment' and are 'reasonably pertinent to diagnosis or treatment.'" *Id.* (citing Fed. R. Evid. 803(4)). "Sexual abuse involves more than physical injury; the physician must be attentive to treating the victim's emotional and psychological injuries, the exact nature and extent of which often depend on the identity of the abuser." *Id.* (citing *Renville*, 779 F.2d at 437). "Furthermore, depending upon the nature of the sexual abuse, the identity of the abuser may be pertinent to the diagnosis and treatment of sexually transmitted diseases." *Id.*

At the delinquency hearing, the district court discussed the admissibility of Pike's statements pursuant to Rule 803(4), which is the "correct legal rule" for determining the admissibility of hearsay for medical diagnosis or treatment. *See George*, 960 F.2d at 99 (applying Rule 803(4)). Accordingly, the district court did not abuse its discretion under the first *Hinkson* step because it applied the correct legal rule.

Under the second *Hinkson* step, a district court abuses its discretion only if the "application of the correct legal standard was (1) 'illogical,' (2) 'implausible,' or (3) without 'support

in inferences that may be drawn from the facts in the record." *Hinkson*, 585 F.3d at 1262. In other sexual abuse cases, this Court has held that admitting similar hearsay statements was not an abuse of discretion. For example, in *United States v. Lukashov*, 694 F.3d 1107 (9th Cir. 2012), a defendant was charged with violating § 2241(c) for allegedly repeatedly sexually abusing his girlfriend's minor child in his car. The minor was taken to a medical clinic that specializes in child abuse and was overseen by the district attorney's office. *Id.* at 1111. A doctor and social worker examined the child, who told them that the defendant "put his 'private part' in 'the part where the poop comes out.'" *Id.* The social worker then interviewed the minor alone, with the doctor and a police office watching from behind a window. *Id.* The social worker sought a more detailed account of the abuse. *Id.* At trial, the social worker's interview was admitted over defendant's objection. *Id.* at 1112. The defendant argued that the interview "was to build a case against him rather than obtain medical diagnosis" based on "the interview's removal from the medical examination setting, the observation of the interview by a police officer, and [the minor's] use of the word 'evidence' during the interview." *Id.* at 1115. This Court held that the district court did not err because "the interview took place for the purpose of, and was reasonably pertinent to, medical diagnosis and treatment." *Id.*

Similarly, in *George*, 960 F.2d 97, the defendant was charged with sexually abusing his daughter. A doctor examined her five months after the alleged abuse, during which exam the minor identified George as the assailant. *Id.* at 98–99. The doctor also testified that "she asked about the assailant's identity for the purpose of diagnosing and treating the victim." *Id.* at 99. George was convicted. *Id.* On appeal, this Court held the district court did not abuse its discretion

in admitting the doctor's testimony. *Id.* at 100–01; *see also People of Territory of Guam v. Ignacio*, 10 F.3d 608, 613 (9th Cir. 1993) (holding the "record does not show that the statement to the social worker was for medical treatment" because the social worker testified that "he questioned the child to determine whether he needed to notify Child Protective Services of a case of suspected child abuse.").

Here, Pike testified that when N.S. arrived for the interview, "we wanted to know if something happened so we could treat him" (similar to the doctor in *George* who testified that "she asked about the assailant's identify for the purpose of diagnosing and treating the victim"). Pike saw N.S. "several times afterwards to provide treatment" and on those visits she spoke with N.S.'s parents "about how to manage" his symptoms. She testified that the MP referred the case to her because "they were concerned about . . . what happened to this child and how can we get him help, if something happened." Pike further testified that she wanted to know what happened "[b]ecause I am concerned that if, indeed, the allegation of sexual abuse happened, that we need to treat him and monitor what is going on with him to see what the after effects are so that we can provide advice and counsel to the parents about how to manage those things, but also help this child move through this incident that happened." This testimony is similar to that of the social worker in *Lukashov*, where the interview "took place for the purpose of, and was reasonably pertinent to, medical diagnosis and treatment." *Lukashov*, 694 F.3d at 1115. Unlike the social worker in *Ignacio*, Pike attempted to understand N.S.'s needs based on the incident he experienced and was not interviewing him to notify authorities.

Accordingly, the district court correctly held that N.S.'s statements to Pike fell within the hearsay exception for medical treatment and diagnosis. Because the district court did not abuse its discretion, Pike's testimony was properly considered by the district court when it found JDT delinquent under Count 6. Reviewing the evidence in the light most favorable to the prosecution, testimony that JDT put his penis in N.S.'s mouth is sufficient to support a delinquency determination.

## VII

JDT contends that the district court erred in denying his Rule 35(a) motion to suspend the finding of delinquency, arguing that the district court "conduct[ed] minimal legal research" into the availability of suspending his delinquency determination, and that "[i]nsofar as the district court's failure to act rested on an incorrect or incomplete legal understanding of what it means to suspend a finding of delinquency . . . , it made a legal error that amounts to an abuse of discretion."

The Government counters the district court did not have jurisdiction to rule on JDT's motion because more than fourteen days had passed since the disposition was announced. It also argues that the district court understood its discretion and "certainly considered the defendant's arguments, but simply was not persuaded."

Whether a district court had jurisdiction to modify its judgment under Rule 35(a) is reviewed de novo. *United States v. Penna*, 319 F.3d 509, 511 (9th Cir. 2003). The district court found JDT to be a juvenile delinquent on December 12, 2011. It announced its disposition

determination the same day. On December 19, 2011, JDT filed a motion to correct the sentence pursuant to Rule 35(a). The district court denied the motion on January 13, 2012.

Rule 35(a) provides: "Within 14 days after sentencing, the court may correct a sentence that resulted from arithmetical, technical, or other clear error." Fed. R. Crim. P. 35(a). The Rule defines "sentencing" as "the oral announcement of the sentence." *Id.* 35(c). We have held that the fourteen-day period to correct a sentence for arithmetical, technical, or other clear error is jurisdictional, and that a district court cannot adjust a sentence outside of the fourteen-day window even if the Rule 35(a) motion is filed within that window. In *United States v. Barragan–Mendoza*, 174 F.3d 1024 (9th Cir. 1999), the district court sentenced the defendant on May 29, 1997. *Id.* at 1025. The Government filed a motion to reconsider the sentence on June 3, 1997, within the then seven-day window of Rule 35(c). *Id.* at 1025–26. Rule 35(a) was formerly Rule 35(c) and had a seven day time limit. Fed. R. Crim. P. 35 advisory committee's note. The district court held the hearing on the motion on July 31, 1997, and modified the sentence. *Id.* at 1026. We explained that "'Rule 35(c) provides the only plausible avenue by which the district court could properly correct or modify [Barragan's] original sentence.'" *Id.* at 1028 (quoting *United States v. Soto–Holguin*, 163 F.3d 1217, 1220 (10th Cir. 1999)). We noted that "[a]lthough the government filed its motion within seven days, the district court did not rule on the motion within that time period," and the "government, nevertheless, argues that it satisfied the requirements of Rule 35(c), because the district court need not actually decide the motion within seven days, as long as the government filed the motion within that period." *Id.* at 1029–30.

We held in *Barragan–Mendoza* that "the district court did not 'act' within seven days from the imposition of sentence and therefore lacked jurisdiction thereafter to modify Barragan's sentence." *Id.* at 1030; *see also United States v. Aguilar–Reyes*, 653 F.3d 1053, 1055–56 (9th Cir. 2011) (holding "the fourteen day provision in Rule 35(a) is jurisdictional" and reinstating defendant's original sentence when defendant was originally sentenced on March 1st, defendant filed a Rule 35(a) motion on March 5th, the district court held a hearing on the Rule 35 motion on March 29th, and resentenced defendant on April 12th); *Penna*, 319 F.3d at 510 ("We hold that the seven-day requirement in Rule 35(c) is a jurisdictional requirement. Here, because the district court vacated Penna's sentence within seven days, but did not resentence him within the same seven day period, it lacked jurisdiction under Rule 35(c) to resentence Penna.").

In this matter, the district court announced its determination that JDT is a juvenile delinquent and announced its disposition determination on December 12, 2011. JDT filed his Rule 35(a) motion on December 19, 2012, seven days after the district court announced its decision. The district court did not rule on the motion until January 13, 2012, a full month after the delinquency hearing. Rule 35(a)'s fourteen-day time limit ran on December 26th. Accordingly, the district court did not have jurisdiction to issue its January 13, 2012 order denying JDT's Rule 35(a) motion.

JDT also maintains the district court abused its discretion in not suspending the determination of delinquency at the disposition hearing on December 12, 2011, because it "did not consider whether the goals of rehabilitation would be promoted by suspending the finding of delinquency." He

asserts the district court did not disclose whether its "'decision is within the range of permissible decisions that the court could have made given the law and the facts confronting it.'" The Government maintains that the district court did not err because JDT's rehabilitative needs were met with carefully tailored conditions. We review sentences for juvenile delinquency for an abuse of discretion. *Juvenile*, 347 F.3d at 784.

"In keeping with its rehabilitative goals, the FJDA disfavors institutionalization and in particular the warehousing of young people away from their communities." *Id.* at 785 (citing 18 U.S.C. § 5039). "Youth who are adjudged to be delinquent under the FJDA must therefore be confined in the least-restrictive environment that will support their continued rehabilitation." *Id.* "It must be clear from the record, if not explicit, that a district court weighed all of the relevant factors and found that the disposition imposed was the least restrictive means to accomplish a young person's rehabilitation," *id.* at 787, particularly when repeatedly urged by a party to adopt one disposition over others.

On this record, it is clear the district court considered detention and probation as two options available under the statute, before settling on the latter. But the district court did not clearly articulate whether the FJDA's rehabilitative purposes would best be advanced by suspension of the delinquency finding, despite repeatedly being asked to do so. As important, it also is not clear that the district court knew it could consider suspension. This lack of clarity requires remand.

As the disposition hearing drew to a close, defense counsel sought to clarify whether "the Court has made a

decision . . . to suspend the finding of delinquency," a request included in JDT's pre-hearing briefing and referenced earlier in the disposition hearing. The district court responded: "I haven't decided whether to make that decision or not." In nearly the same breath, the district court suggested it was unable to suspend the delinquency finding, stating "He's definitely delinquent. I can't suspend the fact that he's delinquent. He's the poster child for being delinquent. We'll talk about the legal niceties later." After discussing an unrelated matter, the district court adjourned the disposition hearing. Four days later, the district court entered an Order of Probation, containing no discussion of suspending the delinquency finding. There are no other indications in the record that the district court weighed factors bearing on suspension while it had jurisdiction to do so. Given the state of the record, we remand this portion of the district court's judgment to allow specific consideration of JDT's suspension request. Our remand parts with the Concurrence in two ways.

First, we are not as confident as the Concurrence that the district court failed to appreciate that the FJDA vests the district court with discretion to suspend (or not) a finding of delinquency. But we acknowledge the record is far from crystalline on this point. Implicit in the district court's comment, that it had yet to decide whether to suspend the delinquency finding, is the recognition that the district court could make such a decision.

In the context of this case, a (possible) implicit recognition of the correct legal rule does not suffice. We have noted "we must remand if we are unable to determine from the record whether the district court's ruling was an exercise of its discretion or a legal ruling" that no such discretion existed. *United States v. Eaton*, 31 F.3d 789, 793

(9th Cir. 1994) (internal quotation marks omitted) (examining district court's failure to expressly address an adult offender's request for downward sentencing departure); *see also United States v. Dickey*, 924 F.3d 836, 839 (9th Cir. 1991). This requirement to remand applies with equal force—if not greater force—to juvenile sentencing matters which may have lifetime consequences for the juvenile. We cannot conclude "[t]he district judge's conduct at the sentencing hearing indicate[d] that he was aware that [suspension] was an option." *United States v. Doe*, 149 F.3d 945, 951 (9th Cir. 1998) (citing *Eaton*, 31 F.3d at 793).

Second, we do not hold that suspension of the delinquency finding is the only appropriate disposition for JDT. While state-law sex offender registration requirements are one relevant factor that should be considered on remand—including the potential for lifetime registration as a sex offender—we disagree with the Concurrence that such requirements, as matter of law, have so negative an affect on JDT's prospects for rehabilitation or on the broader public interest as to overbear other relevant factors favoring probation.

We express no opinion on the proper outcome on remand. The FJDA tasks the district court, not this Court, with balancing relevant factors in the first instance. *See* 18 U.S.C. § 5037(a); *see also Juvenile*, 347 F.3d at 784 (noting that in view of "the discretion [the FJDA] vests in district courts to fashion a [rehabilitative] sentence," we must give deference to the district court "[ i]f an 'essentially factual' inquiry is present, or if the exercise of the district court's discretion is determinative" (quoting *United States v. Owen*, 789 F.2d 750, 752 (9th Cir. 1986))). When considering all available disposition options on remand, the district court may consider

JDT's progress under probation in the twenty months that have passed since imposition of the original disposition.

## CONCLUSION

Accordingly, we **VACATE** the district court's disposition decision, **REMAND** for consideration of all disposition options, including a suspension of delinquency, and **AFFIRM** in all other respects.

---

BERZON, Circuit Judge, concurring:

J.D.T. was a ten-year-old child when the acts for which he was adjudicated occurred.  He was prepubescent and developmentally delayed.  The district court acknowledged at sentencing that even then, a year after the offenses occurred, J.D.T. was "closer to seven or eight with his mental status."  The statute under which he was declared a juvenile delinquent, 18 U.S.C. § 2241(c), makes illegal certain acts, considered inherently sexual in nature if committed by a physically mature individual, without regard to sexual motivation or intent, and regardless of whether the defendant used force or threats to accomplish the act.

I concur in the majority opinion with regard to jurisdiction, sufficiency of the evidence, and the evidentiary issue.  I also concur in the decision to remand with respect to the delinquency finding, but unlike the majority, I believe there is only one proper outcome to that issue on remand.  J.D.T. should not have been treated as a delinquent given his age, the dire possible consequences for his future in light of the recent proliferation of sexual offender registration

statutes, and the lack of prosecutorial guidance provided by
§ 2241(c) as applied to a child offender himself under twelve
years old—the age limit of the victims protected by the
statute.

DISCUSSION

I

Under the Federal Juvenile Delinquency Act (FJDA), the
district court had several options when determining the
disposition of a child found to be a juvenile delinquent. The
FJDA provides that the district court "may suspend the
findings of juvenile delinquency, place him on probation, or
commit him to official detention which may include a term of
juvenile delinquent supervision to follow detention," and may
also impose restitution. 18 U.S.C. § 5037(a). "[A]lthough
the FJDA grants district courts the discretion to select from
among the dispositions authorized under § 5037, this
discretion must be exercised in accordance with the
rehabilitative function of the FJDA, which requires an
assessment of the totality of the unique circumstances and
rehabilitative needs of each juvenile." *United States v.
Juvenile*, 347 F.3d 778, 787 (9th Cir. 2003). "It must be clear
from the record, if not explicit, that a district court weighed
all of the relevant factors and found that the disposition
imposed was the least restrictive means to accomplish a
young person's rehabilitation, given the needs of the child
and the community." *Id.* And the district court "must
provide a reasoned basis for why it has rejected less
restrictive interventions." *Id.* at 788.

J.D.T.'s attorney requested that the finding of juvenile
delinquency be suspended. He argued that, if the court did

not suspend the finding of delinquency, J.D.T. may be required to register as a sex offender for life, and "to brand [J.D.T.] for the rest of his life as a sex offender . . . would be contrary to the purposes of rehabilitation."

The district court nonetheless left the juvenile delinquency finding in place and sentenced J.D.T. to a five-year term of probation. On one level the sentence was a suitable one, as J.D.T. was left in his home and required to undergo therapeutic treatment, rather than committed to an institutional setting. But the district court did not consider whether to suspend the finding of delinquency entirely. Instead, the court stated, "I haven't decided whether to make that decision or not. He's definitely delinquent. I can't suspend the fact that he's delinquent. He's the poster child for being delinquent. We'll talk about the legal niceties later." Thereafter, the district court entered judgment, deeming J.D.T. "a juvenile delinquent" and imposing the probation term.

In expressly refusing to decide whether to suspend the finding of delinquency, the district court abused its discretion in two ways. First, the district court failed to consider one of the statutorily enumerated sentencing options for a juvenile delinquent — suspension of the delinquency finding. That option was less restrictive option than the probation term imposed. Thus, the district court did not consider sufficiently whether the sentence it imposed was the least restrictive means of rehabilitating J.D.T., in violation of the FJDA's mandate.

Second, the district court made clear that it thought that it could *not* suspend the finding of delinquency because J.D.T. was in fact a juvenile delinquent. But a finding that

J.D.T. was a juvenile delinquent was a *necessary predicate* to suspending such a finding — it did not preclude that suspension. The FJDA states, "If the court *finds a juvenile to be a juvenile delinquent*, the court shall hold a disposition hearing concerning the appropriate disposition," and after it holds the disposition hearing, it "may suspend the findings of juvenile delinquency."   18 U.S.C. § 5037(a) (emphasis added).[1]   Thus, it was legal error for the district court to decline to suspend its finding that J.D.T. was a juvenile delinquent on the ground that it lacked the power to do so once it made the finding.[2]

---

[1] A Senate Report discussing a proposed amendment to § 5037 confirms this sequence, explaining that "*[a]fter a finding of juvenile delinquency*, the court is authorized . . . , after a hearing concerning the appropriate disposition, to suspend the finding of juvenile delinquency." S. Comm. on the Judiciary, 94th Cong., 1st Sess., Rep. on the Criminal Justice Reform Act of 1975 1020 (Comm. Print 1975) (emphasis added).

[2] Shortly after sentencing, J.D.T. moved to correct his sentence under Federal Rule of Criminal Procedure 35(a), again asking the district court to set aside the delinquency finding. Several weeks later, the district court denied the motion, explaining, "The Court, after doing some basic research of the statute, the term 'suspend' is not defined or explained and due to the gravity of the nature of these charges, the Court declines to grant the Motion to Correct Sentence." By the time that the district court acted on the motion, it lacked jurisdiction to modify the sentence under Rule 35(a), so its comments at that point are not directly pertinent to whether it committed legal error in treating J.D.T. as a delinquent. *See United States v. Barragan-Mendoza*, 174 F.3d 1024, 1027–30 (9th Cir. 1999). But the district court's comment on denying the motion to correct the sentence does confirm its substantive confusion as to the reach of its authority to suspend the finding of juvenile delinquency.

II

The district court's failure to consider adequately whether to suspend the finding of delinquency is contrary to "the primary purpose of the FJDA . . . to rehabilitate children who have committed criminal acts, assisting them to become successful and productive members of their communities." *Juvenile*, 347 F.3d at 787. Although asked to do so, the district court did not consider a recent legal development that is directly at odds with this "primary purpose" of the FJDA – namely, the fact that in many states, J.D.T. may be required to register as a sex offender, even after he has completed his probation term. In some, his photograph and identifying information may be publicly distributed, despite laws that generally keep juvenile records private.[3] *See* Nicole Pittman and Quyen Nguyen, *A Snapshot of Juvenile Sex Offender Registration and Notification Laws: A Survey of the United States* (2011); Human Rights Watch, *No Easy Answers: Sex*

---

[3] I note that, although neither party has so argued in this case, insofar as state laws may require public disclosure of the name or picture of a child who was adjudicated as a delinquent in federal court for a sexual offense committed while under the age of fourteen, such laws may be preempted by the FJDA's confidentiality provision. *See* 18 U.S.C. § 5038; *United States v. Juvenile Male*, 670 F.3d 999, 1007–08 (9th Cir. 2012) (concluding that § 5038 conflicted with the federal sex offender registration and disclosure requirements created by the Sex Offender Registration and Notification Act (SORNA) for juvenile delinquents who were fourteen years or older at the time of the offense, and that the later enacted SORNA controlled for these older juveniles, but that "[f]or all other juvenile delinquents, the FJDA's confidentiality provisions remain in force").

*Offender Laws in the US* 75–76 (2007).[4]  Although I am not suggesting that all juvenile sex offenders' delinquency findings should be suspended to avoid this consequence (nor am I certain that suspension of the delinquency finding would in all instances avoid the sex offender registration requirements[5]), J.D.T.'s age and lack of recidivism or prior treatment; the strict liability nature of the crime; and the consequent inability to distinguish between the offender and victim all indicate to me that the district court's failure to consider suspending the delinquency finding was a fundamental error.  Indeed, in my view, the suspension should have been not only considered but granted; any other conclusion would have been an abuse of discretion.

Being publicly identified through online registries would have an enormous impact on J.D.T., perhaps for the rest of his life.  First, a registration requirement could severely limit J.D.T.'s ability to find employment in the future.  Employers

---

[4] Among other places, if J.D.T. were to move to Montana, he would be subject to lifelong registration as a sexual offender; state law also makes the name and address of registered sexual offenders publicly available. *See* Mont. Code Ann. §§ 45-5-502(3); 46-23-502(9)(b),(10); 46-23-506(1); 46-23-508(1)(a); *see also United States v. Juvenile Male*, 255 P.3d 110, 112–15 (Mont. 2011) (holding that a juvenile adjudicated as delinquent in federal court for violation of § 2241(c) had a duty under state law to register as a sexual offender when present in Montana). Similarly, if he went to school in Illinois or Iowa, he would be required to register.  *See* 730 Ill. Comp. Stat. 150/3(a-5); Iowa Code §§ 692A.102(1)(c)(34), 103(1)(e), (3).

[5] For example, Colorado requires registration of "any person who receives a disposition or is adjudicated a juvenile delinquent based on the commission of any act that may constitute unlawful sexual behavior *or who receives a deferred adjudication* based on commission of" such an act.  Colo. Rev. Stat. § 16-22-103(4) (emphasis added).

are likely reluctant to hire sex offenders even if the nature of the offense has no bearing on the job. And in some states, registered sex offenders are barred from working in jobs where they may come into contact with children even inadvertently, or where they will be within a certain distance of places where children may be, such as public athletic fields or swimming pools. *See, e.g.*, Phoebe Geer, *Justice Served? The High Cost of Juvenile Sex Offender Registration*, 27 Dev. Mental Health L. 34, 49–50 (2008); Human Rights Watch, *supra*, at 81–84.

Second, J.D.T. may face difficulty in finding housing in the future. Landlords often refuse to rent to registered sex offenders. Human Rights Watch, *supra*, at 95–96. Also, many states and municipalities have laws or ordinances that prohibit registered sex offenders from living in areas near where children may be. *Id.* at 100–04. Such restrictions often "prevent offenders from living in the areas closest to jobs and public transit, since schools, daycare centers, and parks are often built in the center of main residential areas of cities and towns," *id.* at 101, and may restrict registered offenders to very few residential areas, if any, *see, e.g.*, *G.H. v. Township of Galloway*, 951 A.2d 221, 236 (N.J. Super. Ct. App. Div. 2008) (observing that New Jersey ordinances preventing sex offenders from residing within 2,500 feet of any school, park, playground, public library, or daycare center may result in "total exclusion" or "near-total exclusion"); *Fross v. Cnty. of Allegheny*, 20 A.3d 1193, 1199 (Pa. 2011) (observing that similar restrictions "essentially prohibit[] any sex offender from living throughout most of Allegheny County").

Third, registration requirements and their effects undermine the rehabilitative purpose of the juvenile justice

system.  As recognized by the Senate when it first established a separate justice system for children in 1938, "[i]t is . . . advisable that a juvenile delinquent for whom there is some hope of rehabilitation should not receive the stigma of a criminal record that would attach to him throughout his life." S. Rep. No. 75-1989, at 1–2 (1938).  This "negative labeling" serves to "remove" the child "further from the normal socializing process" and for that reason, when amending the FJDA, the Senate recognized that to achieve the goal of rehabilitation, "[a]t each critical step, we should exhaust the less rejecting, less stigmatizing recourses before taking the next expulsive step."  S. Rep. 93-1011, at 24 (1974).  Yet, stigmatizing – "negative labeling" – is inherent in sex offender registration programs (again, absent federal preemption, which has not thus far been invoked here), bringing the two schemes into direct conflict.

These presuppositions of the federal juvenile delinquency legislation are borne out by more recent case law and information, both in general and with regard to sex offenders. "[R]egistries and notification systems cut youth off from beneficial social networks, creating social stigma and isolation, increasing the risk of suicide, alienating a youth from school and community, and raising barriers to successful participation in society."  Justice Policy Institute, *Youth Who Commit Sex Offenses: Facts and Fiction* 2 (collecting sources).  As recognized by the Supreme Court, "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds," and children "are more capable of change than are adults."  *Graham v. Florida*, 560 U.S. 48, 68 (2010); *see also J.D.B. v. N. Carolina*, 131 S.Ct. 2394, 2403 n.5 (2011). Studies show that children who commit sex offenses have relatively low recidivism rates and are more susceptible to

treatment and rehabilitation than adult sex offenders. *See* Human Rights Watch, *supra*, at 69–70 (collecting sources); Nat'l Center on Sexual Behavior of Youth, Office of Juvenile Justice and Delinquency Prevention, U.S. Dep't of Justice, *What Research Shows About Adolescent Sex Offenders* 1 (2003) (same); *see also United States v. Juvenile*, 347 F.3d 778, 789 n.9 (9th Cir. 2003) (recognizing that "virtually all of the studies show . . . that relatively few [juvenile sex offenders] are charged with a subsequent sex crime" and "sexual recidivism of juvenile sexual offenders post-treatment was very rare") (brackets in original)(internal quotation marks omitted).

Labeling J.D.T. as a delinquent sex offender for the rest of his life is all the more questionable here, as J.D.T.'s parents had voluntarily initiated the involvement of the local child protection agency and had started counseling for him. *See Juvenile*, 347 F.3d at 789 n.9 (studies "have found that successful treatment of juveniles who have sexually offended is facilitated by the participation of the child's family"); *United States v. Juvenile Male*, 864 F.2d 641, 644 (9th Cir. 1988) (observing that "Congress' desire to channel juveniles into state and local treatment programs" is "clearly expressed in the legislative history of section 5032"). Indeed, the testimony before the district court illustrated that J.D.T. was responding well to treatment and had not continued to act out sexually with other children.[6]

---

[6] To a degree, the statutory scheme under which J.D.T. was prosecuted, and the district judge's disposition, recognize these concerns. Because J.D.T. was prosecuted under the FJDA, the sentencing provisions of § 2241(c) were inapplicable to the proceedings. An adult who is convicted of violation of § 2241(c) faces imprisonment "for not less than 30 years or for life." 18 U.S.C. § 2241(c). In contrast, under the FJDA, J.D.T. could not be placed in official detention past his twenty-first

The need for rehabilitation and treatment, rather than retribution and condemnation, is particularly heightened due to J.D.T.'s unique characteristics. J.D.T., ten years old at the time of the offenses and not yet pubescent, is developmentally delayed, "emotionally immature for his age," receives special education services, has Attention Deficit Hyperactivity Disorder, and takes numerous daily medications to control his behavior. Further, we have recognized previously that "[a]ge-inappropriate sexual knowledge is a common symptom among sexually abused children," *Juvenile*, 347 F.3d at 781 n.1, which the prosecutor believed J.D.T. likely was.

Whatever may be the case for an older child or for a child adjudicated for a violent crime, creating a situation in which a ten-year-old offender with J.D.T.'s characteristics and background is stigmatized — possibly publicly — for life as a sex offender is fundamentally at odds with the FJDA's recognition of the rehabilitative prospects for children. The potential consequences of the district court's delinquency finding will only make it more difficult to rehabilitate J.D.T., especially in conjunction with the tremendous developmental and emotional issues that he faces.

---

birthday. 18 U.S.C. § 5037(c). The reason that differences such as this one exist is that "the FJDA was intended to provide for the care and treatment of juvenile delinquents, in recognition of significant differences between juvenile delinquents and adult offenders." *Juvenile Male*, 670 F.3d at 1004 (internal quotation marks and citations omitted). The district court's decision to sentence J.D.T. to probation rather than placing him in a detention facility was based on rehabilitative concerns and a recognition that a custodial sentence may "make things worse." But the district court still was required to consider whether an alternative less restrictive than the delinquency finding was appropriate.

III

A second consideration also influences my conclusion that the only appropriate disposition in this case was suspension of the delinquency finding. As applied to children under twelve years old, 18 U.S.C. § 2241(c) reflects at least one of two defects that underlie the Constitutional vagueness doctrine — namely, it accords infinite discretion to prosecutors to assign victim and offender status, with no guidance from the statute as to how to do so.

Section 2241(c) criminalizes what is commonly referred to as statutory rape. The section provides in relevant part, "Whoever . . . in the special maritime and territorial jurisdiction of the United States . . . knowingly engages in a sexual act with another person who has not attained the age of 12 years . . . shall be fined under this title and imprisoned for not less than 30 years or for life."

The provision makes it an offense for a person to engage in sexual acts with a child under the age of twelve, regardless of whether the offender knew the child's age. Lack of consent is not an element, because children under the age of twelve are legally incapable of providing consent. Unlike certain other federal criminal statutes, § 2241(c) does not have as an element the use or threatened use of physical force or harm to carry out the sexual act. *See, e.g.*, 18 U.S.C. §§ 2241(a), 2242(1). Nor is sexual motivation or impact an element.[7]

---

[7] 18 U.S.C. § 2246(2) defines sexual act as:

> (A) contact between the penis and the vulva or the penis and the anus, and for purposes of this

"To satisfy due process, 'a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement'." *Skilling v. United States*, 561 U.S. 358, 402–03 (2010) (formatting in original) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). "The void-for-vagueness doctrine embraces these requirements." *Id.* The Supreme

---

> subparagraph contact involving the penis occurs upon penetration, however, slight;
>
> (B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;
>
> (C) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or
>
> (D) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

J.D.T. was charged and adjudicated as delinquent for committing a sexual act as defined in subsections (A) and (B), and not subsections (C) or (D). Therefore, the government did not have to prove that he acted "with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." 18 U.S.C. §§ 2246(2)(C), (D).

In fact, J.D.T. originally was charged with one count that did require such a showing. The government voluntarily dismissed that charge at the conclusion of its presentation of evidence because, as the majority observes, the evidence "was apparently insufficient to prove" that count. Maj. Op. at 10.

Court has recognized "that the more important aspect of vagueness doctrine 'is not actual notice, but the other principal element of the doctrine — the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Kolender*, 461 U.S. at 358 (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)). "Where the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Id.* (quoting *Smith*, 415 U.S. at 575).

Section 2241(c), as applied to children under the age of twelve who engage in sexual acts with other children under the age of twelve,  encourages arbitrary and discriminatory enforcement.  On occasion, children engage in mutual sexual play. *See, e.g.*, *In re M.D.*, 527 N.E.2d 286 (Ohio 1988) (case involving a five-year-old putting his penis in the mouth of another five-year-old at the direction of another child while the three were "playing doctor").  When the sexual conduct at issue involves an adult and a child under the age of twelve, only the adult can be the perpetrator and only the child can be the victim.  But when two children under twelve years old engage in sexual conduct with one another, the statute provides no guidance as to who is the offender and who is the victim.  Instead, under the terms of the statute, each child is both an offender and a victim.

As the Ohio Supreme Court explained when it invalidated a similar state statute as unconstitutionally vague,

> The facts of this case provide an example of the temptation for prosecutors to label one child as the offender and the other child as the victim.  Based apparently upon the theory that

D.B. forced M.G. to engage in sexual conduct, the state alleged that D.B., but not M.G., had engaged in conduct that constituted statutory rape.  However, while the theory of D.B. as the aggressor was consistent with the counts alleging a violation of R.C. 2907.02(A)(2), which proscribes rape by force, this theory is incompatible with the counts alleging a violation of statutory rape because anyone who engages in sexual conduct with a minor under the age of 13 commits statutory rape regardless of whether force was used.  Thus, if the facts alleged in the complaint were true, D.B. and M.G. would both be in violation of R.C. 2907.02(A)(1)(b).

*In re D.B.*, 950 N.E.2d 528, 533 (Ohio 2011), *cert. denied*, 132 S. Ct. 846 (2011).  The Ohio courts have applied *D.B.* to bar prosecution of children even where there is a significant age difference between the alleged perpetrator and victim. *See In re D.R.*, 2012 WL 5842773, at \*4–6 (Ohio Ct. App. 2012).

Similarly, here, the elements of the offenses with which J.D.T. was charged do not involve the use of force or threats of force.  Under the facts *proven* here, if § 2241(c) can apply to children under the age of twelve, J.D.T. and the other children involved were *all* in violation of the statute.  That one child and not the other was considered to be the aggressor would not matter.  That the prosecutors apparently *considered* J.D.T. the culpable young child does not cure the unfettered discretion problem, as the factors that suggest that J.D.T. was the aggressor are extraneous to the statute.  They are matters

fully within the prosecutors' discretion to rely upon or not, as the prosecutors choose.

And prosecutors do not always make their charging decisions in a constrained or wise way. In *State ex rel. Z.C.*, 165 P.3d 1206 (Utah 2007), for example, the state prosecuted *both* children who engaged in sexual conduct with one another. The children in *Z.C.* were twelve and thirteen years old, and engaged in consensual sexual intercourse; the statute criminalized such behavior with children under fourteen years old. *Id.* at 1207–08.

Placing such unconstrained discretion within the hands of prosecutors because the statute itself contains no ascertainable limits is precisely the problem the prosecutorial discretion strain of the vagueness doctrine is designed to cure. By entrusting the development of minimum standards for enforcement to the case-by-case judgment of prosecutors, legislatures "abdicate their responsibilities for setting the standards of the criminal law." *See Smith*, 415 U.S. 575.

The majority insists that the statute is not unconstitutionally vague, because it applies to "whoever" engages in the proscribed conduct, and the forbidden acts are spelled out quite clearly. As to the notice aspect of the vagueness doctrine, I might agree that the statute "define[s] the criminal offense . . . with sufficient definiteness that ordinary people can understand what conduct is prohibited." *Skilling*, 561 U.S. at 402.

But this "ordinary people" standard takes on an air of unreality when applied to a ten-year-old with a mental and emotional capacity of a seven- or eight-year-old. More importantly, the breadth of prosecutorial discretion — even

if one assumes that it was intended by Congress[8] — must inform the exercise of the district court's authority to suspend the juvenile delinquency finding. Where, as here, the *actual* possible consequences for a very young child — lifetime designation as a registered sex offender in some states — is at odds with the presuppositions of the FJDA, the lack of guidance the statute otherwise provides calls for the most meticulous exercise of judicial discretion when imposing a disposition. It was thus particularly important for the district court to understand the disposition options and to consider carefully which alternative was the least restrictive means to rehabilitate the young child before it.

---

[8] Although there are contrary indications as well, some aspects of the legislative history for § 2241(c) suggest that Congress may have intended to leave charging decisions in cases involving two young children to prosecutorial discretion. During a hearing on an earlier version of the Sexual Abuse Act of 1986, which added § 2241(c), the Department of Justice suggested removal of the age difference limitation that "would make it an offense for a person to engage in a sexual act with an individual less than twelve years old only if the actor were at least four years older than the victim," a requirement that was ultimately eliminated when § 2241(c) was enacted. Federal Rape Law Reform: Hearing Before the Subcomm. on Criminal Justice of the H. Comm. on the Judiciary, 98th Cong., 2nd Sess. 96 (1984) (statement of Victoria Toensing, Dep. Ass't Atty. Gen., Dep't of Justice). The Department of Justice opined that "[t]he effect of such legislation might be to send an unfortunate signal that the Congress condones sexual activity by and with pre-teenage children, so long as both participants are of similar tender years." *Id.* It urged that instead Congress should "criminalize sexual activity by anyone with a person under twelve years old, and leave to prosecutorial and judicial discretion the occasions when such activity occurs between two persons of very young age." *Id.* at 96–97. It reassured, "[w]e are not aware of any instance in which such discretion is alleged to have been abused." *Id.* at 97.

IV

In my view, given the specific possible consequences for J.D.T., his age and circumstances, and the lack of prosecutorial guidance provided by the offense statute regarding children under twelve, any result other than suspension of the delinquency finding would be an abuse of discretion.

It must be remembered that, even if we were to hold that § 2241(c) is unconstitutional as applied to a child under the age of twelve who engages in sexual acts with other children under the age of twelve, a child in that age group still could be found guilty of rape if other additional elements were found that differentiated the perpetrator from the victim — for example, if the offender used force or threats, 18 U.S.C. §§ 2241(a), 2242(1); if the offender rendered another person unconscious or drugged the person, 18 U.S.C. § 2241(b); or if the other person was physically incapable of refusing to participate in the act, 18 U.S.C. § 2242(2)(B). But J.D.T. was not charged with violations of any of these provisions. And to apply a statutory rape provision to prosecute a developmentally delayed ten-year-old child is in extreme tension with the aims of the FJDA, for all of the reasons I have surveyed.

In sum, the district court should have suspended the delinquency finding. As the district court applied the wrong legal rule in failing to consider J.D.T.'s suspension request, I concur in the majority's decision to remand the case with an instruction that the district court make a determination on that issue.